709 A.2d 779

DAVID METTINGER, PLAINTIFF, v. GLOBE SLICING MACHINE
CO., INC., NEW GLOBE PARENT, INC., DAPHNE HORIZON,
CO., INC., ABC 1-5 (SAID ENTITIES BEING FICTITIOUS AND
UNKNOWN), AND XYZ 1-5 (SAID ENTITIES BEING FICTI-
TIOUS AND UNKNOWN COMPONENT PARTS MANUFACTUR-
ERS), DEFENDANTS, AND W.W. LOWENSTEN, INC., DEFEN-
DANT AND THIRD PARTY PLAINTIFF-RESPONDENT, v.
GLOBE FOOD EQUIPMENT COMPANY, THIRD PARTY DE-
FENDANT-APPELLANT.

Argued November 17, 1997—Decided May 14, 1998.

372

*Joel Schneider,* argued the cause for appellant (*Archer & Greiner,* attorneys; *George F. Kugler, Jr.* and *Sean T. O'Meara,* on the briefs).

*Michelle Wall,* argued the cause for respondent (*Melli & Wright,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

The ultimate issue is whether W.W. Lowensten, Inc. (Lowensten), a distributor, which sold and serviced a defective meat slicer that injured plaintiff, David Mettinger, is entitled to maintain an action for indemnification against Globe Food Equipment Company (Globe Food), the alleged successor to the product line of the manufacturer, Globe Slicing Machine Co. (Globe Slicing). The Law Division rejected Lowensten's claim for indemnification, and the Appellate Division reversed, 292 *N.J.Super.* 293, 678 *A.*2d 1115 (1996). We granted Globe Food's petition for certification, 149

*N.J.* 139, 693 *A.*2d 109 (1997), and affirm the judgment of the Appellate Division.

## I.

The underlying action arose out of an accident that occurred on November 22, 1988, at a Quik–Check convenience store in Clifton, New Jersey. On that date, Mettinger, an assistant manager, accidentally cut his right hand on the unguarded blade of a "Globe Model 500" meat slicing machine (meat slicer).

The relevant facts may be summarized as follows. Mettinger instituted a products liability action against Globe Slicing, Lowensten, and several fictitious corporate defendants. He amended his complaint to name New Globe Parent, Inc. (New Globe), Daphne Horizon Co., Inc. (Daphne), and Mozley Manufacturing Co., Inc. (Mozley) as defendants. Mettinger alleged that in 1987, Globe Slicing sold its outstanding stock together with its assets and liabilities to New Globe. New Globe then sold Globe Slicing's meat-slicer assets to Mozley. Thereafter, New Globe changed its name to Daphne, and Globe Slicing merged into Daphne.

All defendants answered Mettinger's complaint. Lowensten asserted crossclaims against the other defendants. Globe Slicing, New Globe, Daphne, and Mozley failed to answer interrogatories. Pursuant to *Rule* 4:23–5, the Law Division dismissed their answers and entered defaults against them.

In December 1992, Lowensten asserted a third-party complaint against Globe Food. Lowensten claimed that Globe Food was a successor to the producers of the "Globe" meat-slicer product line, namely, Globe Slicing, New Globe, Daphne, and Mozley. Globe Food was incorporated in February 1991, and purchased Mozley's meat-slicer assets in May 1991. The asset-purchase agreement between Mozley and Globe Food required Mozley to indemnify Globe Food from, among other things, any liability arising out of product-liability actions brought against Globe Food or its indemnities related to products that were manufactured or sold before

the date of purchase. Globe Food was aware of Mettinger's lawsuit before its purchase of Mozley.

Lowensten provided Globe Food with all discovery obtained in the matter before its appearance. Globe Food also participated in discovery. It answered Lowensten's interrogatories and requests for documents, and appeared at depositions, including that of Globe Food's president, Hilton Garner.

The Law Division granted Globe Food's motion for summary judgment dismissing Lowensten's third-party complaint seeking indemnification. The court found the existence of a genuine issue of material fact on the issue whether Globe Food had continued Globe Slicing's product line. It declined, however, to extend to Lowensten's benefit the product-line exception to successor liability adopted in *Ramirez v. Amsted Industries,* 86 *N.J.* 332, 431 *A.*2d 811 (1981). The court held that the product-line exception benefitted plaintiffs only. Because the court found that the statute of limitations had expired on Mettinger's claims against Globe Food, it granted Globe Food's motion for summary judgment dismissing Lowensten's third-party complaint for indemnification.

Mettinger proceeded to trial against Lowensten. The jury returned a verdict in favor of Mettinger in the amount of $350,000.

On Lowensten's appeal, the Appellate Division upheld the judgment for Mettinger, but reversed the grant of summary judgment in favor of Globe Food, holding that Lowensten could maintain an action for indemnification against Globe Food. The Appellate Division reasoned that Mettinger could have pursued an action against Globe Food as a successor to Globe Slicing. 292 *N.J.Super.* at 315–17, 678 *A.*2d 1115. It concluded that because both Globe Food and Lowensten were potentially liable to Mettinger, Mettinger's decision to sue only Lowensten should not predetermine whether Globe Food or Lowensten is ultimately liable. *Id.* at 317, 678 *A.*2d 1115.

The Appellate Division remanded the matter for trial on the issue whether Globe Food sufficiently continued the product line

of Globe Slicing to justify the imposition of successor liability on it. *Ibid.* The court held, however, that Mettinger's judgment on liability and damages against Lowensten bound Globe Food. *Id.* at 318, 678 *A.*2d 1115. Consequently, the court refused to grant Globe Food a new trial on liability and damages if, on remand, Globe Food was found liable to indemnify Lowensten. *Id.* at 317–18, 678 *A.*2d 1115. The Appellate Division relied on *N.J.R.E.* 803(c)(26), which permits a judgment debtor seeking indemnity to introduce a final judgment entered against it in a prior action as conclusive evidence of the judgment debtor's liability, the facts on which the judgment is based, and the reasonableness of the damages recovered in that action, provided the defendant in 'the indemnification action had notice and an opportunity to defend 'the first action. Additionally, the Appellate Division held that Mettinger had timely sued Globe Slicing. Consequently, the statute of limitations pertaining to his personal injury claim, *N.J.S.A.* 2A:14–2, would not have barred Mettinger's claim against Globe Food. The court concluded that Mettinger's failure to join Globe Food "should not determine whether the burden of paying his damages should ultimately rest on Lowensten or on Globe Food[ ]." 292 *N.J.Super.* at 317, 678 *A.*2d 1115.

## II.

 Generally, liability for injuries caused by defective products extends from the manufacturer down the chain of distribution to distributors and retailers. *Promaulayko v. Johns Manville Sales Corp.*, 116 *N.J.* 505, 510–11, 562 *A.*2d 202 (1989). A consumer injured by a defective product may bring a strict liability action against any business entity in the chain of distribution. *Id.* at 511, 562 *A.*2d 202. The underlying public policy is that those engaged in the producing and marketing enterprise should bear the cost of marketing defective products. *Nieves v. Bruno Sherman Corp.*, 86 *N.J.* 361, 371, 431 *A.*2d 826 (1981). Absent an agreement to the contrary, however, distributors and retailers are entitled to indemnification from the manufacturer. *Promaulayko, supra,* 116 *N.J.*

at 511, 562 A.2d 202. The rationale is that the liability of distributors and retailers is merely vicarious, but the manufacturer's liability is primary. *Ibid.*

Traditionally, if the manufacturer sells or transfers its assets to another company, the successor is not liable either to injured parties or to distributors and retailers unless: (1) the purchaser expressly or impliedly agreed to assume such debts or liabilities; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is entered into fraudulently to escape the debt or liability. *McKee v. Harris–Seybold Co.,* 109 *N.J.Super.* 555, 561, 264 A.2d 98 (Law Div.1970), *aff'd,* 118 *N.J.Super.* 480, 288 A.2d 585 (App. Div.1972). A fifth exception, sometimes incorporated in one of the preceding exceptions, arises from the absence of adequate consideration for the sale or transfer. *Ibid.* Thus, under traditional rules, neither plaintiffs nor distributors and retailers may maintain an action against a successor corporation unless they can establish one of the exceptions.

In *Ramirez v. Amsted Industries, supra,* however, this Court abandoned the traditional approach in the products liability context and adopted the "product-line exception" to successor corporation liability, holding:

> [W]here one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

> [86 *N.J.* at 358, 431 A.2d 811.]

In *Nieves v. Bruno Sherman Corp., supra,* decided the same day as *Ramirez,* we extended the product-line exception. We permitted the plaintiff in *Nieves* to maintain an action against an intermediary successor corporation that acquired the original manufacturer's assets and continued its product line but sold those assets to another corporation before plaintiff's accident occurred.

86 *N.J.* at 368, 431 *A.*2d 826. By acquiring the business assets of the original manufacturer and continuing to manufacture and sell its product line, the intermediary successor "became 'an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products.' " *Id.* at 371, 431 *A.*2d 826 (quoting *Ray v. Alad Corp.*, 19 *Cal.*3d 22, 136 *Cal.Rptr.* 574, 582, 560 *P.*2d 3, 11 (1977)).

Only a minority of states have adopted the *Ramirez* product-line exception. *See Restatement (Third) of Torts* § 12 cmt. b (1997). Critics of the exception believe that it is unfair, socially wasteful, and may lead to the piecemeal transfer of assets. *Ibid.* On this appeal, however, neither party challenges the validity of the *Ramirez* exception, and we continue to believe it strikes a sound accommodation of the competing interests.

In *Ramirez,* we recognized three reasons for imposing potential liability on a successor corporation that acquires the assets and continues the manufacturing operation of its predecessor:

(1) The virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.

[86 *N.J.* at 349, 431 *A.*2d 811 (quoting *Ray, supra,* 136 *Cal.Rptr.* at 582, 560 *P.*2d at 11).]

Subsequent lower court decisions have examined a plaintiff's right to use the product-line exception to hold successor manufacturers liable for injuries caused by their predecessors' products. *See, e.g., Bussell v. DeWalt Prods. Corp.*, 259 *N.J.Super.* 499, 614 *A.*2d 622 (App.Div.1992) (permitting, among other things, use of product-line exception against successor corporation that continued to manufacture "essentially" same product), *certif. denied,* 133 *N.J.* 431, 627 *A.*2d 1137 (1993); *Goncalves v. Wire Tech. & Mach. Co.*, 253 *N.J.Super.* 327, 601 *A.*2d 780 (Law Div.1991) (permitting plaintiff injured by defective equipment to maintain action against successor corporation that allegedly purchased manufacturer's assets in liquidation proceeding and continued product line); *Wilk-*

*erson v. C.O. Porter Mach. Co.,* 237 *N.J.Super.* 282, 567 *A.*2d 598 (Law Div.1989) (permitting injured plaintiff to use product-line exception against successor manufacturer that purchased original manufacturer's assets in bankruptcy sale); *Brotherton v. Celotex Corp.,* 202 *N.J.Super.* 148, 493 *A.*2d 1337 (Law Div.1985) (holding that *Ramirez*'s product-line exception is applicable to recovery of compensatory damages only, not punitive damages). To date, however, no New Jersey decision has examined whether a defendant distributor or retailer may use the product-line exception to maintain a third-party action for indemnification against a successor manufacturer.

■ Globe Food argues that the product-line exception is intended to benefit injured plaintiffs only and does not support Lowensten's indemnification claim. To support its argument, Globe Food relies on *Hill v. Trailmobile, Inc.,* 412 *Pa.Super.* 320, 603 *A.*2d 602 (1992). In *Hill,* an intermediate Pennsylvania appellate court upheld the trial court's refusal to permit defendant Trailmobile, Inc., which manufactured a trailer containing an allegedly defective power gear, to seek indemnification from alleged successors to the manufacturer of the defective power gear. The court rested its decision on two grounds. First, it stated that "[t]he product-line exception is a remedy which was created to afford relief to *plaintiffs,* victims of manufacturing defects who, due to the sale or transfer of the manufacturing corporation, otherwise would have no avenue of redress for injuries caused by defective product" *Id.* 603 *A.*2d at 607. It believed that permitting Trailmobile to obtain indemnification from the successors would "subvert[ ] the policy considerations that prompted adoption of the rule." *Ibid.* Second, the court reasoned that justice did not require imposition of liability on the successor corporation because Trailmobile could have obtained indemnification from the parent corporation of the power-gear manufacturer, which had contractually assumed its subsidiary's liabilities, had it timely asserted a claim against it. *Ibid.* Moreover, the court found Trailmobile's "efforts to extend the product-line exception in this case particu-

larly inappropriate[,]" *ibid.*, because the purchase of the power-gear manufacturer's assets did not virtually destroy Trailmobile's remedies and because neither of the purchasers could properly be considered "successors" to the manufacturer. *Ibid.*

We decline to apply the product-line exception so narrowly. More persuasive is the reasoning of the California Court of Appeal, which explained:

> The constant theme of strict tort liability has been "to elevate justice and equity above the exact contours of a mathematical equation...."
>
> Fundamental fairness has been sought through a balancing of the rights of the injured party against the rights of those engaged in business, including the latter's reasonable commercial expectations. Placing the economic burden of injuries on those best able to pay for those costs while permitting the transfer of that burden to those most culpable is consistent with the equitable considerations inherent in the resolution of the difficult problems which have been judicially posed.
>
> [*Rawlings v. D.M. Oliver, Inc.*, 97 *Cal.App.*3d 890, 159 *Cal.Rptr.* 119, 124 (1979) (citation omitted).]

Thus, in *Rawlings*, the court applied the product-line exception to a successor corporation even though its predecessor's product was not mass-produced but was manufactured in accordance with the owner's plans and specifications. *Id.* at 124–25. *See also Kaminski v. Western MacArthur Co.*, 175 *Cal.App.*3d 445, 220 *Cal.Rptr.* 895, 901–02 (1985) (permitting product-line exception to be used against successor distributors as well as manufacturers).

■ Although a primary justification for the product-line exception is to provide compensation for otherwise remediless victims of a defective product, the imposition of successor liability on corporations also serves the public interest "of spreading the risk to society at large for the costs of injuries from defective products." *Ramirez, supra,* 86 *N.J.* at 350, 431 *A.*2d 811; *see also Ray, supra,* 136 *Cal.Rptr.* at 579, 560 *P.*2d at 8 ("The paramount policy to be promoted by the rule is the protection of otherwise defenseless victims of manufacturing *and the spreading throughout society of the cost of compensating them.*") (emphasis added). In general, manufacturers are better positioned to avoid and allocate risk than distributors. *See Promaulayko, supra,* 116 *N.J.* at 513,

562 *A.*2d 202 (indicating that those higher in chain of distribution are more efficient accident avoiders and better able to bear risk); *Suter v. San Angelo Foundry & Mach. Co.*, 81 *N.J.* 150, 173, 406 *A.*2d 140 (1979) (finding that manufacturers are "in the best position to make the cost-benefit analysis between accident costs and accident avoidance costs and to act on that decision once it is made").

Moreover, successor manufacturers that acquire resources previously available to the original manufacturer such as its trade name, physical plants, manufacturing equipment, inventory, records of manufacturing designs, patents, customer lists, and employees have "virtually the same capacity as [the original manufacturer] to estimate the risks of claims for injuries from defects in previously manufactured [products] for purposes of obtaining insurance coverage or planning self-insurance." *Ray, supra*, 136 *Cal.Rptr.* at 581, 560 *P.*2d at 10. Likewise, the successor manufacturer can distribute the cost of insuring against injuries among all purchasers of its product.

If the product-line exception did not redound to the benefit of distributors and retailers as well as claimants, the distributors and retailers that are liable to the injured party would be cut-off from recourse against the successor to the manufacturer. *Ibid.* Recourse against a successor corporation is justified "as a burden necessarily attached to [the successor's] enjoyment of [the original manufacturer's] trade name, good will and the continuation of an established manufacturing enterprise." *Ramirez, supra*, 86 *N.J.* at 352, 431 *A.*2d 811. "Public policy requires that having received the substantial benefits of the continuing manufacturing enterprise, the successor corporation should also be made to bear the burden of the operating costs that other established business operations must ordinarily bear." *Id.* at 353, 431 *A.*2d 811. Ordinarily, the manufacturer must bear the cost of indemnifying entities lower in the chain of distribution for injuries caused by defects in its products. *Promaulayko, supra*,

116 *N.J.* at 511, 562 *A.*2d 202. Therefore, the successor manufacturer also must bear that cost.

Any other conclusion would lead to unacceptable results. Globe Food acknowledges that if it is the successor to Globe Slicing then Mettinger could have pursued a claim against it directly using the product-line exception. Under those circumstances, Lowensten would have been entitled to file a cross-claim for indemnification against Globe Food. Merely because Mettinger failed to name Globe Food as a defendant should not preclude Lowensten from asserting its claim against Globe Food. As the Appellate Division found below, "plaintiff's choice of defendants should not determine whether the burden of paying [Mettinger's] damages should ultimately rest on Lowensten or on Globe Foods." 292 *N.J.Super.* at 317, 678 *A.*2d 1115; *see also Gangemi v. National Health Labs., Inc.,* 305 *N.J.Super.* 97, 106, 701 *A.*2d 965 (App.Div.1997) (explaining that plaintiff's failure to name potentially liable party as defendant does not preclude existing defendant from seeking contribution or indemnification from that party).

Consequently, we hold that, absent an agreement to the contrary, distributors and retailers may use the product-line exception to seek indemnification from corporations that purchased all or substantially all of the original manufacturer's assets and undertook essentially the same manufacturing operation as that corporation.

### III.

Globe Food asserts that even if retailers and distributors may resort to the product-line exception to obtain indemnification, application of the exception against it is inappropriate. Underlying Globe Food's assertion is its perception of the unfairness of holding it liable for Mettinger's injuries because Globe Food did not exist when Mettinger was injured or when he filed suit. According to Globe Food, it has not benefitted from the continuation of Globe Slicing's product line or its good will. Furthermore,

it had no opportunity to implement cost avoidance and risk spreading measures.

■ Application of the product-line exception, however, is not contingent on the timing of a plaintiff's injury. *See Rawlings, supra,* 159 *Cal.Rptr.* at 123 (holding that plaintiff's right to use product-line exception against successor manufacturer was unaffected by fact that claimant's injuries occurred three months before successor manufacturer's purchase of enterprise). The exception is premised on the theory that corporations that purchase manufacturing assets and continue a product line become " 'an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products.' " *Nieves, supra,* 86 *N.J.* at 371, 431 *A.*2d 826 (quoting *Ray, supra,* 136 *Cal.Rptr.* at 582, 560 *P.*2d at 11).

No unfairness inheres in imposing successor liability on a corporation that purchases assets after an injury has occurred. Although the successor was not benefitting from its predecessor's enterprise or good will at the time of plaintiff's injury, it so benefitted after its purchase. Moreover, a successor's knowledge of pre-existing claims permits it to take those claims into consideration when determining the terms of its asset acquisition. *See Ramirez, supra,* 86 *N.J.* at 354, 431 *A.*2d 811. Presumably, the purchase price will reflect any potential liability. *Ibid.* Additionally, the successor may enter into full or partial indemnification or escrow agreements with the selling corporation. *Ibid.* Indeed, Globe Food extracted such an indemnification provision from Mozley. Finally, the successor manufacturer is still in the best position to spread the risk of liability among consumers by raising its prices.

Globe Food also contends that Lowensten's third-party complaint fails to assert any common-law or contractual basis for indemnity, that Globe Food was not a joint tortfeasor, and that Lowensten's claim for contribution was barred by the statute of limitations. We disagree.

Lowensten's third-party complaint expressly demanded "judgment for contribution and indemnification from the third-party defendant, Globe Food Equipment Company." Thus, Globe Food's contention that Lowensten sought only contribution is simply incorrect. From the inception, moreover, the essence of Lowensten's claim has been one for common-law indemnification. The third-party complaint identified the Mettinger action as one pending in strict liability and stated that Globe Food's liability rested on Lowensten's contention that it was "a successor to the defendants who manufactured the slicer in question[.]" A fair reading of the allegation is that it seeks indemnification, a point that Globe Food has made clear on appeal.

 Furthermore, the statute of limitations did not bar Lowensten's right to seek contribution or indemnification from Globe Food. The two-year statute of limitations imposed on a plaintiff's claims for personal injuries does not preclude a defendant's claim for contribution or indemnification. *McGlone v. Corbi*, 59 *N.J.* 86, 95, 279 *A.*2d 812 (1971); *McNally v. Providence Washington Ins. Co.*, 304 *N.J.Super.* 83, 94, 698 *A.*2d 543 (App. Div.1997); *Biddle v. Biddle*, 163 *N.J.Super.* 455, 458, 395 *A.*2d 218 (Law Div.1978). Rather, the statute of limitations pertaining to a defendant's claim for contribution or indemnification begins to accrue when the plaintiff recovers a judgment against it. *McGlone*, 59 *N.J.* at 95, 279 *A.*2d 812. Under the entire controversy doctrine, if those claims are known, they should be asserted in the original action. *Harley Davidson Motor Co. v. Advance Die Casting, Inc.*, 150 *N.J.* 489, 502, 696 *A.*2d 666 (1997). Thus, even if Mettinger's potential claims against Globe Food had expired, Lowensten could still seek contribution or indemnification from Globe Food. Because Mettinger had not yet obtained a judgment against Lowensten, the statute of limitations on Lowensten's claim for contribution or indemnification had not begun to accrue. Likewise, because Lowensten asserted its claim against Globe Food in Mettinger's action, Lowensten complied with the entire controversy doctrine.

## IV.

Globe Food further maintains that if Lowensten may pursue its claim for indemnification, due process requires that Globe Food receive a new trial on damages and liability against Lowensten. The Appellate Division disagreed, holding that Globe Food is entitled to a trial only on its obligation to indemnify Lowensten. 292 *N.J.Super.* at 317, 678 *A.2d* 1115. It held that, if Globe Food is found liable to indemnify Lowensten, *N.J.R.E.* 803(c)(26) forbids Globe Food from contesting Mettinger's judgment against Lowensten. *Id.* at 317–18, 678 *A.2d* 1115.

Globe Food submits that it is entitled to a new trial on liability and damages under *Johnson v. Cyklop Strapping Corp.*, 220 *N.J.Super.* 250, 531 *A.2d* 1078 (App.Div.1987), *certif. denied,* 110 *N.J.* 196, 540 *A.2d* 189 (1988). In *Johnson,* the Appellate Division found that the Law Division had erred in refusing to vacate its grant of partial summary judgment in favor of a manufacturer and its successor. *Id.* at 264–65, 531 *A.2d* 1078. As a consequence of the grant of partial summary judgment, the defendant distributor was left to defend the action alone. *Id.* at 257, 531 *A.2d* 1078. The jury awarded plaintiff substantial damages against the distributor. *Ibid.* To rectify the error without disturbing plaintiff's judgment against the distributor, the Appellate Division permitted the distributor to seek contribution and indemnification from the manufacturers in a plenary proceeding in which the manufacturers could litigate their respective liability and damages. *Id.* at 265, 531 *A.2d* 1078. In reaching its decision, the court stated:

> [W]here contribution is in issue, an alleged joint tortfeasor against whom a contribution is made is entitled to "have his day in court as to both liability and damages." The same is clearly so in respect of a common-law indemnity claim. [The successor manufacturer's] liability as a joint tortfeasor or as a common-law indemnitor has never been determined, and [the distributor] must bear the burden of proving that liability now, as must [the successor manufacturer] against [the manufacturer]. Moreover, since all claims against [the manufacturer and its successor] were dismissed long before trial, we are of the view that both may address the damages issue as well in respect of their obligations on the cross-claims.
>
> [*Id.* at 265–66, 531 *A.2d* 1078 (citations omitted).]

 We believe the better rule is that when the erroneous grant of summary judgment for a codefendant is reversed on appeal, the court is permitted to grant that codefendant a new trial on liability and damages only when the remaining defendants seek contribution, as distinguished from indemnification. A claim for contribution, unlike one for indemnification, requires a factfinder to apportion fault among defendants. By comparison, when indemnification is in issue, *N.J.R.E.* 803(c)(26) governs.

 *N.J.R.E.* 803(c)(26) provides:

[T]he record of a final judgment is admissible if offered by the judgment debtor in an action in which he seeks to recover partial or total indemnity or exoneration for money paid or a liability incurred because of the judgment, as evidence of the liability of the judgment debtor, of the facts on which the judgment is based, and of the reasonableness of the damages recovered. If the defendant in the second action had notice and an opportunity to defend the first action, the judgment is conclusive evidence.

Basically, the rule bars an indemnitor from relitigating an indemnitee's underlying liability or the amount and reasonableness of the damages recovered against the indemnitee when the indemnitor received procedural due process.

 Due process is a flexible concept that calls for such procedural protections as fairness demands. *New Jersey Parole Bd. v. Byrne,* 93 *N.J.* 192, 209, 460 *A.*2d 103 (1983). The essential components of due process are notice and an opportunity to be heard. *Mullane v. Central Hanover Bank & Trust Co.,* 339 *U.S.* 306, 313, 70 *S.Ct.* 652, 656–57, 94 *L.Ed.* 865, 873 (1950); *Doe v. Poritz,* 142 *N.J.* 1, 106, 662 *A.*2d 367 (1995). Thus, a party's due process rights are not violated if it is held liable for a judgment arising out of an action in which it participated or had the opportunity to be heard. *Louisville & Nashville R.R. Co. v. Schmidt,* 177 *U.S.* 230, 238–39, 20 *S.Ct.* 620, 623, 44 *L.Ed.* 747 (1900); *Bussell, supra,* 259 *N.J.Super.* at 510–11, 614 *A.*2d 622.

 Here, Globe Food not only had notice of the Mettinger action, but actually participated in it. Lowensten properly served Globe Food with a third-party complaint seeking indemnification for its potential liability to Mettinger. It did so for the express

purpose of compelling Globe Food to defend against Mettinger's claims. Globe Food answered interrogatories and otherwise participated in discovery. Through no fault of Lowensten, Globe Food erroneously obtained a summary judgment dismissing Lowensten's third-party complaint.

At trial, Lowensten vigorously challenged Mettinger's claims on both liability and damages. No conflict of interest existed between Globe Food and Lowensten on those issues. *See Restatement (Second) of Judgments* § 57 (1982) (requiring that indemnitee defend action with due diligence and reasonable prudence and that there be no conflict of interest between indemnitee and indemnitor). Thereafter, Lowensten satisfied Mettinger's judgment.

It would be unfair and inefficient to permit Globe Food to benefit from its erroneous procurement of a summary judgment dismissing Lowensten's claim for indemnification and to require Lowensten to relitigate its liability to Mettinger. *Cf. Ramos v. Browning Ferris Indus. of S. Jersey, Inc.*, 194 *N.J.Super.* 96, 102–03, 476 *A.*2d 304 (App.Div.1984) (refusing to remand plaintiff's tort claim for new trial where third-party defendant erroneously obtained summary judgment, reasoning that plaintiff should not suffer because of third-party defendant's wrongful rejection of its obligation and right to defend), *rev'd on other grounds*, 103 *N.J.* 177, 510 *A.*2d 1152 (1986). Because Lowensten seeks indemnification, its recovery against Globe Food is limited to the amount it paid Mettinger. A new trial on liability and damages could inure only to the benefit of Globe Food.

## V.

██ Finally, Globe Food contends that permitting Lowensten to rely on the product-line exception to support its indemnification claim and on *N.J.R.E.* 803(c)(26) to bar Globe Food from relitigating liability and damages constitute new rules of law that should apply prospectively. We disagree. Our holding is consistent with prior decisions concerning strict products liability, successor liabil-

ity, and indemnification. Furthermore, Globe Food knew of Mettinger's action when it acquired Mozley's meat-slicing assets. Indeed, Globe Food required Mozley partially to indemnify it against such lawsuits. Its liability is not unexpected.

The judgment of the Appellate Division is affirmed as modified, and the matter is remanded to the Law Division.

GARIBALDI, J., dissenting.

The majority expands the product-line exception to enable a defendant to sue a successor corporation for indemnification, even though the injured plaintiff has already recovered for his injuries. Extending the product-line exception to benefit corporate defendants undermines the policy justification for the product-line exception—making injured plaintiffs whole. Because such an expansion of the product-line exception is unwise and unwarranted, I dissent.

I

Plaintiff David Mettinger injured his hand on an unguarded blade of a "Globe Model 500" meat slicer. He then instituted a products liability claim against W.W. Lowensten, Inc., New Globe Parent, Inc., Daphne Horizon Co., Inc., and Mozely Manufacturing Co., Inc. Lowensten filed a third party complaint against Globe Food Equipment Co., asserting that Globe Food was a successor to the manufacturer of the Globe meat slicer product line. The trial court granted summary judgment in favor of Globe Food, concluding that the product-line exception benefitted only plaintiffs. Mettinger's claim against Lowensten proceeded to trial. A jury awarded Mettinger $350,000. The Appellate Division upheld the award against Mettinger, but reinstated the indemnification claim against Globe Food. The panel remanded for trial on the issue of whether Globe Food sufficiently continued the Globe Slicing product line to justify the imposition of successor liability. Additionally, the court held that if, on remand, Globe Food was

found to have continued the product line, Globe Food would be bound by the judgment against Lowensten.

## II

Traditionally, "[w]here one company sells or otherwise transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor, including those arising out of the latter's tortious conduct." *Wilson v. Fare Well Corp.*, 140 *N.J.Super.* 476, 484, 356 *A.2d* 458 (Law Div.1976) (quoting *McKee v. Harris-Seybold Co.*, 109 *N.J.Super.* 555, 264 *A.2d* 98 (Law Div.1970), *aff'd*, 118 *N.J.Super.* 480, 288 *A.2d* 585 (App.Div.1972)).

In *Ramirez v. Amsted Industries, Inc.*, this Court recognized that the traditional approach to corporate successor liability was "unresponsive to the legitimate interests of the product liability plaintiff," and did not protect "the innocent injured party." 86 *N.J.* 332, 341, 354, 431 *A.2d* 811 (1981) (citations omitted). The Court, therefore, abandoned the traditional approach and adopted the "product-line exception." That exception provides:

[W]here one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessors.

[*Id.* at 358, 431 *A.2d* 811.]

Further, the Court provided three policy justifications for adopting the product-line exception:

(1) The virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.

[*Id.* at 349, 431 *A.2d* 811 (quoting *Ray v. Alad Corp.*, 19 *Cal.*3d 22, 136 *Cal.Rptr.* 574, 582, 560 *P.*2d 3, 11 (1977)).]

Though the majority concedes that providing an otherwise remediless plaintiff with a source of compensation was a primary justification for adopting the product-line exception, *see ante* at

383, 709 A.2d at 784, the majority fails to recognize that "[t]he central thesis of [the product-line exception] is premised on the elimination by the successor of an effective remedy. *That is an essential condition precedent to recovery.*" 86 *N.J.* at 358, 431 A.2d 811 (Schreiber, J., concurring) (emphasis added). Therefore, where, as in the present case, the plaintiff has already recovered for his injuries, the product-line exception is inapplicable.

*Nieves v. Bruno Sherman Corp.*, 86 *N.J.* 361, 431 *A.2d* 826 (1981), decided the same day as *Ramirez, supra*, 86 *N.J.* 332, 431 A.2d 811, is consistent with that understanding. In *Nieves, supra*, the Court extended the product-line exception to enable a plaintiff to recover from an intermediate corporation that acquired the assets of the original manufacturer, continued its product line, but sold those assets to another corporation before plaintiff was injured. *Id.* at 368, 431 *A.2d* 826. Even though the Court extended the product-line exception, the Court continued to view a remediless plaintiff as a prerequisite for invoking the product-line exception. *See id.* at 371, 431 *A.2d* 826. Moreover, regarding apportionment of liability after the plaintiff is made whole, the Court explained: "While the *Ramirez* rationale is concerned with imposing strict tort liability for damages caused by defects in units of the product line acquired and continued by successor manufacturers, *neither Ramirez nor the injured plaintiff ... is concerned with how the liability will be allocated ....*" *Id.* at 372, 431 *A.2d* 811 (emphasis added).

### A.

In *Ramirez, supra*, the Court rested its adoption of the product-line exception on social and economic policy grounds. The Court recognized that adopting the product-line exception may prevent small manufacturers from transferring ownership of their business assets for a fair price. 86 *N.J.* at 353, 431 *A.2d* 811. However, the Court held that such "concerns, genuine as they may be, cannot be permitted to overshadow the basic social policy, now so well-entrenched in our jurisprudence, that favors imposition of the

costs of injuries from defective products on the manufacturing enterprise and consuming public rather than on the innocent injured party." *Id.* at 354, 431 *A.*2d 811.

The Court also rested the adoption of the product-line exception on economic policy, concluding that, even though successor liability would result in lowering the purchase price of a corporation's assets,

> a reduction of the sale price by an amount calculated to compensate the successor corporation for the potential liability it has assumed is a more, not less, accurate measure of the true worth of the business.
>
> ... In time, the risk-spreading and cost avoidance measures ... should become a normal part of business planning in connection with the corporate acquisition of assets of a manufacturing enterprise.
>
> [*Id.* at 354–55, 431 *A.*2d 811.]

Those justifications for adopting the product-line exception, however, have been decried as "unfair and socially wasteful." *Restatement (Third) of Torts* § 12 comment b (1997) (hereinafter "Restatement"). Moreover, the product-line exception has been criticized for "impeding the free alienability of corporate assets" for no compelling reason, "thereby discouraging shareholder investment of capital and increasing social cost." *Restatement, supra,* § 12 comment b. Similarly, it has been recognized that

> [t]he imposition of successor liability on a company that has merely purchased the assets of a predecessor for cash and does not otherwise fall within the [traditional] exceptions would encourage the dissolution of a financially troubled corporation by piecemeal sale of assets rather than as a going concern. The end result would be the needless destruction of an ongoing business enterprise with no net advantage to anyone.
>
> [*Restatement, supra,* § 12 reporters' note (citing *Polius v. Clark Equip. Co.,* 802 *F.*2d 75 (3d Cir.1986)).]

*See also Bernard v. Kee Mfg. Co., Inc.,* 409 *So.*2d 1047, 1049 (Fla.1982) ("We choose not to join this vanguard of courts, due in part to the threat of economic annihilation that small businesses would face under such a rule of expanded liability."); A. Schiff, *Products Liability and Successor Corporations: Protecting the Product User and the Small Manufacturer Through Increased Availability of Products Liability Insurance,* 13 *U.C. Davis L.Rev.* 1000, 1003 (1980) (noting that most small companies are

unable to obtain insurance coverage for liabilities from injuries caused by a predecessor's products).

It is, therefore, not surprising that the overwhelming majority of states that have considered the product-line exception have rejected it. *See, e.g., Page v. Gulf Oil Co.,* 812 *F.*2d 249, 250 (5th Cir.1987) (applying Louisiana law); *Reed v. Armstrong Cork Co.,* 577 *F.Supp.* 246, 247–48 (E.D.Ark.1983) (applying Arkansas law); *LeSane v. Hillenbrand Indus., Inc.,* 791 *F.Supp.* 871, 873–74 (D.D.C.1992) (applying the law of the District of Columbia); *Johnston v. Amsted Indus.,* 830 *P.*2d 1141, 1147 (Colo.Ct.App.1992); *Bernard, supra,* 409 *So.*2d at 1049–50; *Bullington v. Union Tool Corp.,* 254 *Ga.* 283, 328 *S.E.*2d 726, 728 (1985); *Myers v. Putzmeister, Inc.,* 232 *Ill.App.*3d 419, 173 *Ill.Dec.* 130, 134, 596 *N.E.*2d 754, 758, *appeal denied,* 146 *Ill.*2d 632, 176 *Ill.Dec.* 804, 602 *N.E.*2d 458 (1992); *DeLapp v. Xtraman, Inc.,* 417 *N.W.*2d 219, 222 (Iowa 1987); *Stratton v. Garvey Int'l, Inc.,* 9 *Kan.App.*2d 254, 676 *P.*2d 1290, 1297–98 (1984); *Guzman v. MRM/Elgin,* 409 *Mass.* 563, 567 *N.E.*2d 929, 933 (1991); *Pelc v. Bendix Mach. Tool Corp.,* 111 *Mich.App.* 343, 314 *N.W.*2d 614, 620 (1981); *Niccum v. Hydra Tool Corp.,* 438 *N.W.*2d 96, 100 (Minn.1989); *Young v. Fulton Iron Works Co.,* 709 *S.W.*2d 927, 940 (Mo.Ct.App.1986); *Jones v. Johnson Mach. & Press Co.,* 211 *Neb.* 724, 320 *N.W.*2d 481, 484 (1982); *Simoneau v. South Bend Lathe, Inc.,* 130 *N.H.* 466, 543 *A.*2d 407 (1988); *Downtowner, Inc. v. Acrometal Products, Inc.,* 347 *N.W.*2d 118, 125 (N.D.1984); *Flaugher v. Cone Automatic Mach., Co.,* 30 *Ohio St.*3d 60, 507 *N.E.*2d 331, 338 (1987); *Goucher v. Parmac, Inc.,* 694 *P.*2d 953, 954 (Okla.Ct.App.1984); *Hamaker v. Kenwel–Jackson Mach. Inc.,* 387 *N.W.*2d 515, 521 (S.D.1986); *Griggs v. Capitol Machine Works, Inc.,* 690 *S.W.*2d 287, 294 (Tex.Ct.App.), *writ denied,* 701 S.W.2d 238 (Tex.1985); *Ostrowski v. Hydra–Tool Corp.,* 144 *Vt.* 305, 479 *A.*2d 126, 127 (1984); *Harris v. T.I., Inc.,* 243 *Va.* 63, 413 *S.E.*2d 605, 609 (1992); *Fish v. Amsted Indus., Inc.,* 126 *Wis.*2d 293, 376 *N.W.*2d 820, 829 (1985); *accord Nissen Corp. v. Miller,* 323 *Md.* 613, 594 *A.*2d 564, 570 (1991) (applying the traditional rule of successor liability and noting that the product-line exception has been rejected by many jurisdictions as

"too far-reaching and radical"). Those courts have all recognized that, for both economic and social reasons, the product-line exception is unjustifiable.

## B.

Aside from New Jersey, only four other states have adopted the product-line exception: California, New Mexico, Pennsylvania, and Washington. *See Ray v. Alad Corp., supra,* 19 *Cal.*3d 22, 136 *Cal.Rptr.* 574, 560 *P.*2d 3 (1977); *Garcia v. Coe Mfg. Co.,* 123 *N.M.* 34, 933 *P.*2d 243, 250 (1997); *Dawejko v. Jorgensen Steel Co.,* 290 *Pa.Super.* 15, 434 *A.*2d 106, 110 (1981); *Martin v. Abbott Labs.,* 102 *Wash.*2d 581, 689 *P.*2d 368, 388 (1984). Of those four states, none have extended the product-line exception to benefit defendants. *See* 63 *Am.Jur.2d Products Liability* § 133 (1996) ("The product line theory may not be applied to support a claim for contribution or indemnity made by an initial successor corporation against a subsequent corporation; the purpose of [the] product-line exception is to compensate otherwise remediless tort victims.").

In *Hill v. Trailmobile, Inc.,* 412 *Pa.Super.* 320, 603 *A.*2d 602, 607 (1992), the defendant/lessor of a truck trailer sought indemnification from the product line successor to the manufacturer. In affirming a lower court ruling that indemnification could not be sought under the product-line exception, the Pennsylvania Superior Court explained:

> Original defendant Trailmobile is now asking this court to extend the product-line exception to successor liability to apply for the first time to *defendants.* This we are unwilling to do. The product-line exception is a remedy which was created to afford relief to *plaintiffs,* victims of manufacturing defects who, due to the sale or transfer of the manufacturing corporation, otherwise would have no avenue of redress for injuries caused by defective products. *Trailmobile's effort to obtain indemnification from co-defendants through the product-line exception subverts the policy considerations that prompted adoption of the rule.*
>
> [*Id.* 603 *A.*2d at 607 (emphasis added) (citations omitted).]

Similarly, in *Shorb v. Airco, Inc.,* 644 *F.Supp.* 923, 928 (E.D.Penn.1986), the court refused to permit a successor corporation to use the product-line exception to recover from an interme-

diate successor corporation after the plaintiffs had settled their claim. The court explained that allowing a successor corporation to use the product-line exception to recover from a prior successor corporation was "not contemplated, let alone mandated, by any of the cases on the product-line exception, the purpose of which is to compensate otherwise remedyless [sic] tort victims, not to preempt the role of contract in corporate successorships." *Id.* at 929.[1]

Even if the Court is convinced that the product-line exception should remain as the law of this State, there is no justification for extending that exception to benefit corporate defendants. Once the plaintiff has recovered for his injuries, the policy considerations that prompted the adoption of the rule no longer exist. There is no connection between the public policy considerations in *Ramirez*—enabling an injured consumer to recover for his injuries—and the present case. Globe Food was not even in existence at the time the injury occurred. It acquired the predecessor corporation's assets two and one-half years after Mettinger's accident, one year after his lawsuit had been filed and six months after the statute of limitations for Mettinger to sue Globe Food had expired. Moreover, because Globe Food was not in existence at the time of Mettinger's accident, it could not have acted to avoid his loss.

Lowensten, on the other hand, could have acted to avoid the risk of harm to plaintiff. Lowensten sold and serviced the defective slicer to Mettinger's employer and provided the care and operation booklets. Lowensten knew where the slicer was located and, more significantly, at the time it sold the slicer to Mettinger's employer, it sold the same slicer to other customers, *but with* an interlock. Moreover, Lowensten could have protected itself by

---

[1] The court did not decide whether Pennsylvania law or New Jersey law would govern, as it determined that under the laws of both states, the product-line exception was not available. 644 *F.Supp.* at 927.

insisting on a contractual indemnity provision. However, it did not so do.

Underlying the product-line exception is the concept of fairness. Declining to expand the product-line exception to cover Globe Food does not impose any liability on Lowensten that did not already exist under New Jersey law. As a seller of a defective product, Lowensten is liable to the injured plaintiff. However, making Globe Food pay for an accident it did not cause and could not avoid provides a windfall to Lowensten and creates liability for Globe Food where none had previously existed. Such a result is unfair.

Because I would hold that the product-line exception is not available to benefit corporate defendants, I would not reach the other issues addressed by the Court. I would reverse the judgment of the Appellate Division.

COLEMAN, J., joins in this dissent.

*For modification, affirmance and remandment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, and STEIN—5.

*For reversal*—Justices GARIBALDI and COLEMAN—2.